## STATE OF CONNECTICUT *v.* MICHAEL FOSTER
### (12717)

PETERS, C. J., HEALEY, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued December 2, 1986—decision released March 17, 1987

*Joseph G. Bruckmann,* assistant public defender, with whom, on the brief, were *Joette Katz,* public defender, and *Suzanne Zitser,* assistant public defender, for the appellant (defendant).

*Judith Rossi,* deputy assistant state's attorney, with whom, on the brief, were *Kevin McMahon,* assistant state's attorney, and *James G. Clark,* deputy assistant state's attorney, for the appellee (state).

SANTANIELLO, J. The defendant, Michael Foster, was convicted in a jury trial of kidnapping in the second degree in violation of General Statutes § 53a-94, assault in the third degree in violation of General Statutes § 53a-61, and being an accessory to criminally negligent homicide in violation of General Statutes §§ 53a-8 and 53a-58. He received an effective sentence of ten years, suspended after six years and five years probation. He claims on appeal that the trial court erred: (1) in instructing the jury on the crime of being an accessory to criminally negligent homicide and in denying his posttrial motions for judgment of acquittal and in arrest of judgment; (2) in denying his motion for judgment of acquittal on the third count because there was insufficient evidence to support a conviction; and (3) in instructing the jury on the essential elements of kidnapping in the second degree. We find no error.

The jury could reasonably have found the following facts. In June, 1982, the defendant was living with his girlfriend and their child in an apartment near the Martin Luther King School in Hartford. At approximately 7:30 p.m. in the evening of June 16, 1982, while walking near the school, the defendant's girlfriend was robbed and raped by a young black male who held a straight-edged razor to her throat. During the one half hour encounter, she observed her attacker's features and later that night described him and the clothes

he was wearing to the police. She also described the assailant, with specific identifiable features, to the defendant.

The defendant, who was "bitter" about the attack, purposely went looking for his girlfriend's attacker. On June 22, 1982, the defendant and a friend, Otha Cannon, after visiting with the defendant's girlfriend for a short period of time, went walking in the vicinity where the rape and robbery had occurred. Near the Martin Luther King School, the defendant saw a man he thought matched the description of the assailant. After telling Cannon "[t]his is the guy who raped my lady," the defendant and Cannon confronted the suspected rapist, later identified as William Jack Middleton, in an alleyway next to the school. Upon being approached, Middleton became frightened and denied any involvement in the robbery or rape. He attempted to flee and a fight ensued; the defendant beat Middleton about the face, eye, chest and head with his fist and a blunt instrument, knocking him to the ground. The defendant, desiring to bring his girlfriend to the scene to make an identification, told Middleton to "wait here" while he left to get her. Although Middleton agreed to wait, the defendant, suspecting that he might flee, gave a knife to Cannon and told him to stay with Middleton to prevent his escape. Thereafter, while waiting for the defendant to return, Middleton, as he was reaching for something in his pocket, apparently charged at Cannon. As Middleton ran toward him, Cannon held out the knife that the defendant had given him and fatally stabbed Middleton. The victim had a straight-edged razor in his pocket which was later identified by the defendant's girlfriend as the one wielded by her assailant during the rape incident.

The defendant was charged, by an information, with one count of second degree kidnapping, one count of second degree assault, one count of first degree man-

slaughter, one count of carrying a dangerous weapon, one count of hindering prosecution in the first degree, one count of being an accessory to second degree kidnapping, one count of being an accessory to second degree assault, and one count of being an accessory to first degree manslaughter.

Prior to the beginning of the state's case, the trial court granted the defendant's motion to dismiss the count of hindering prosecution in the first degree and a substituted count of hindering prosecution in the second degree. Subsequently, at the close of the state's case-in-chief, the defendant moved for a judgment of acquittal, which the trial court granted as to the count of carrying a dangerous weapon. The state then filed a substitute amended information charging the defendant with kidnapping in the second degree in violation of General Statutes § 53a-94 (a),[1] assault in the second degree in violation of General Statutes § 53a-60 (a) (2),[2] manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3),[3] being an accessory to kidnapping in the second degree in violation of General Statutes §§ 53a-8[4] and 53a-94 (a), being an accessory to

---

[1] "[General Statutes] Sec. 53a-94. KIDNAPPING IN THE SECOND DEGREE: CLASS B FELONY. (a) A person is guilty of kidnapping in the second degree when he abducts another person.

"(b) Kidnapping in the second degree is a class B felony."

[2] "[General Statutes] Sec. 53a-60. ASSAULT IN THE SECOND DEGREE: CLASS D FELONY. (a) A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[3] "[General Statutes] Sec. 53a-55. MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person. . . ."

[4] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intention-

assault in the second degree in violation of General Statutes §§ 53a-8 and 53a-60 (a) (2), and being an accessory to manslaughter in the first degree in violation of General Statutes §§ 53a-8 and 53a-55 (a) (3).

The court instructed the jury on each count in the substitute amended information. In its charge on the count of manslaughter in the first degree, the court instructed the jury on the lesser included offenses of manslaughter in the second degree and criminally negligent homicide.[5] The court further instructed the jury as to the liability of an accessory.

During its deliberations, the jury requested that the court "explain accessory to manslaughter and lesser degrees." The court then restated the elements of manslaughter in the first and second degrees and the elements of criminally negligent homicide, and accessorial liability. The defendant subsequently took an exception to the court's charge. The jury later asked the court again to explain accessory to manslaughter, at which time the judge reinstructed the jury as to the essential elements of the charge, including the lesser included offenses. The defendant again duly excepted.

The jury found the defendant guilty of kidnapping in the second degree, assault in the third degree in violation of General Statutes § 53a-61,[6] as a lesser included

ally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[5] Although manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3) requires a different state of mind than criminally negligent homicide in violation of § 53a-58, we have recognized that criminally negligent homicide is a lesser included offense of manslaughter in the first degree. See *State* v. *Rodriguez*, 180 Conn. 382, 429 A.2d 919 (1980).

[6] "[General Statutes (Rev. to 1981)] Sec. 53a-61. ASSAULT IN THE THIRD DEGREE: CLASS A MISDEMEANOR. (a) A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or (2) he

offense of second degree assault, and being an accessory to criminally negligent homicide in violation of General Statutes §§ 53a-8 and 53a-58,[7] as a lesser included offense of being an accessory to first degree manslaughter. Thereafter, the defendant filed motions for acquittal and in arrest of judgment,[8] claiming, inter alia, that there was no such crime as being an accessory to criminally negligent homicide. The trial court denied both motions. The defendant appealed.

## I

The defendant first claims that the trial court erred (1) in instructing the jury as to the crime of being an accessory to criminally negligent homicide, and (2) in denying his posttrial motions for judgment of acquittal and in arrest of judgment. We disagree.

General Statutes § 53a-8 provides in relevant part that "[a] person, acting with the mental state required for the commission of an offense, who . . . intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct . . . as if he were the principal offender." We have previously stated that a conviction under § 53a-8 requires proof of a dual intent, i.e., "that the accessory have the intent to *aid* the principal *and* that in so

recklessly causes serious physical injury to another person; or (3) with criminal negligence, he causes physical injury to another person by means of a deadly weapon or a dangerous instrument.

"(b) Assault in the third degree is a class A misdemeanor."

[7] "[General Statutes] Sec. 53a-58. CRIMINALLY NEGLIGENT HOMICIDE: CLASS A MISDEMEANOR. (a) A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person, except where the defendant caused such death by a motor vehicle.

"(b) Criminally negligent homicide is a class A misdemeanor."

[8] "[Practice Book] Sec. 905. ——MOTION IN ARREST OF JUDGMENT

"On motion of the defendant, the judicial authority shall arrest judgment if the indictment or information does not charge an offense or if the judicial authority was without jurisdiction of the offense charged. The motion in arrest of judgment shall be made prior to the imposition of sentence."

aiding he intend to *commit* the offense with which he is charged." (Emphasis in original.) *State* v. *Harrison,* 178 Conn. 689, 694, 425 A.2d 111 (1979); see *State* v. *Crump,* 201 Conn. 489, 495, 518 A.2d 378 (1986); *State* v. *Fleming,* 198 Conn. 255, 271, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986); *State* v. *Nardini,* 187 Conn. 513, 531, 447 A.2d 396 (1982).

Citing this "dual intent" requirement, and relying on *State* v. *Almeda,* 189 Conn. 303, 455 A.2d 1326 (1983),[9] and *State* v. *Beccia,* 199 Conn. 1, 505 A.2d 683 (1986),[10] cases which held that persons cannot attempt

[9] In *State* v. *Almeda,* 189 Conn. 303, 455 A.2d 1326 (1983), this court considered whether a defendant could be convicted of attempted manslaughter in violation of General Statutes §§ 53a-49 (a) (2) and 53a-55 (a) (1). We first reasoned that the intent required for attempt liability is the intent required for the commission of the substantive crime, and as such the criminal result must be the conscious objective of the actor's conduct. Id., 307. We further acknowledged that the crime of manslaughter in the first degree, in violation of § 53a-55 (a) (1), required the intent to cause serious injury, rather than the death of the victim. Id., 307–309. Consequently, we recognized that a person, in committing manslaughter in violation of § 53a-55 (a) (1), does not intend that death occur. Therefore, we concluded that "the crime of attempted involuntary manslaughter requires a logical impossibility, namely that the actor in his attempt intend that an unintended death result." Id., 309.

[10] In *State* v. *Beccia,* 199 Conn. 1, 505 A.2d 683 (1986), we considered whether a person could be convicted of conspiracy to commit arson in the third degree, in violation of General Statutes §§ 53a-48 and 53a-113. To establish the crime of conspiracy, we reasoned that the state must show that an agreement was entered into " 'to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed.' *State* v. *Ortiz,* 169 Conn. 642, 645, 363 A.2d 1091 [1975]." *State* v. *Beccia,* supra, 3. Additionally, we noted that the essential elements of third degree arson are the intentional starting of a fire or causing of an explosion thereby recklessly damaging or destroying a building. Id., 4. Thus unless the damage or destruction was the result of reckless conduct, there could be no violation of the statute. Id. Because reckless conduct was an essential element to the crime, and because conspirators cannot agree to accomplish a required specific result recklessly, we held that conspiracy to commit arson in the third degree is not a crime cognizable under Connecticut law. Id., 4–5.

or conspire to commit an offense that requires an unintended result, the defendant argues that a person cannot be convicted as an accessory to criminally negligent homicide. He reasons that because accessorial liability requires an accused, in aiding a principal, to "intend to commit the offense with which he is charged" and because criminally negligent homicide requires that an unintended death occur, the crime of being an accessory to criminally negligent homicide is a logical impossibility in that it would require a defendant, in aiding another, to intend to commit a crime in which an unintended result occurs.

We find the defendant's argument unpersuasive. The defendant's reliance upon *Almeda* and *Beccia,* and the concept of "dual intent," is misplaced. Attempt and conspiratorial liability differ substantially from the liability imposed on an accessory. First, both attempt and conspiracy are offenses in and of themselves, while accessorial liability is not. Attempt is a distinct, inchoate offense and a defendant may be punished for attempting to commit a substantive offense without actually committing the crime. General Statutes §§ 53a-49, 53a-51; see *State* v. *Trent,* 182 Conn. 595, 600, 438 A.2d 796 (1981). Likewise, conspiracy has been recognized as being a crime distinct from the commission of the substantive offense. See General Statutes § 53a-48. "We have repeatedly held that conspiracy is a common-law crime and punishable as such under the statutes relating to the punishment of high crimes and misdemeanors. The commission of the substantive offense and a conspiracy to commit it are separate and distinct crimes. . . . The crime of conspiracy is dependent on clear principles, and has characteristics and ingredients which separate it from all other crimes." *State* v. *Johnson,* 162 Conn. 215, 218–19, 292 A.2d 903 (1972); see *State* v. *Crump,* supra, 497; *State* v. *Baker,* 195 Conn. 598, 608, 489 A.2d 1041 (1985).

There is, however, no such crime as "being an accessory." *State* v. *Edwards,* 201 Conn. 125, 130, 513 A.2d 669 (1986); *State* v. *Harris,* 198 Conn. 158, 163, 502 A.2d 880 (1985); *State* v. *Baker,* supra. The defendant is charged with committing one substantive offense; "[t]he accessory statute merely provides alternate means by which a substantive crime may be committed." *State* v. *Baker,* supra; *State* v. *Edwards,* supra, 131.

Second, the intent required for attempt or conspiratorial liability is distinguishable from the requisite intent for accessorial liability. A careful examination of the relevant statutes reveals the distinction. Under § 53a-49 (a), "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he: (1) *Intentionally engages in conduct which would constitute the crime* if attendant circumstances were as he believes them to be; or (2) *intentionally does or omits to do* anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step *in a course of conduct planned to culminate in his commission of the crime.*" (Emphasis added.) Similarly, under § 53a-48 (a), "[a] person is guilty of conspiracy when, with the *intent that conduct constituting a crime be performed,* he agrees with one or more persons *to engage in or cause the performance of such conduct* . . . ." (Emphasis added.)

Intentional conduct is defined as conduct "with respect to a result or to conduct described by a statute defining an offense when [a person's] *conscious objective is to cause such a result* or to engage in such conduct." (Emphasis added.) General Statutes § 53a-3 (11). Thus, to be guilty of attempt, a defendant's conscious objective must be to cause the result which would constitute the substantive crime. A person cannot attempt to commit a crime which requires that an unintended

result occur, such as involuntary manslaughter, because it is logically impossible for one to intend to bring about an unintended result.[11] *State* v. *Almeda,* supra. Similarly, to be guilty of conspiracy, the defendant, upon entering an agreement, must intend that his conduct achieve the requisite criminal result. When the substantive crime requires an unintended result, a person cannot conspire to commit that crime because it is logically impossible to agree to achieve a specific result unintentionally.[12] *State* v. *Beccia,* supra.

Contrary to the defendant's assertions, and unlike attempt or conspiratorial liability, accessorial liability does not require that a defendant act with the conscious objective to cause the result described by a statute. Although we have stated that the defendant, in intentionally aiding another, must have the intent to commit the substantive offense; *State* v. *Crump,* supra; *State* v. *Fleming,* supra; *State* v. *Haddad,* 189 Conn. 383, 389, 456 A.2d 316 (1983); *State* v. *Nardini,* supra; this language must be read in context. All the cases which speak of this "dual intent" involve crimes that require a defendant to act with a specific intent to com-

---

[11] According to LaFave and Scott, liability for attempt does not encompass crimes in which "the complete crime consists of recklessly or negligently causing a certain result, for if there were an intent to cause such a result then the attempt would not be to commit that crime but rather the greater crime of intentionally causing such result. For example, so long as the crime of attempt is deemed to require an intent-type of mental state, there can be no such thing as an attempt to commit criminal-negligence involuntary manslaughter. 'The consequence involved in that crime is the death of the victim and an act done with intent to achieve this, if attempt at all, is attempted murder.' " W. LaFave & A. Scott, Criminal Law (1972) § 59, p. 430.

[12] Both the attempt statute and the conspiracy statute require "specific intent" before a defendant may be convicted. Section 53a-48 requires that a defendant must possess a specific intent to agree to the performance or causation of criminal conduct; Conn. Gen. Stat. Ann. § 53a-48, Commission Comment; while § 53a-49 requires a defendant to have a specific intent to commit the crime which he is alleged to have attempted. Conn. Gen. Stat. Ann. § 53a-49, Commission Comment.

mit the crime. See *State* v. *Crump,* supra, 495 (accessory to robbery in the second degree requiring the defendant to have the intent to commit larceny, i.e., the intent to deprive another of property); *State* v. *Fleming,* supra, 271 (accessory to felony murder, underlying felony being robbery, requiring defendant to have intent to commit larceny); *State* v. *Vincent,* 194 Conn. 198, 206–207, 479 A.2d 237 (1984) (accessory to robbery in the third degree, requiring intent to deprive another of property); *State* v. *Haddad,* supra (accessory to burglary requiring specific intent to commit a crime upon entering a building); *State* v. *Nardini,* supra, 531 (accessory to arson requiring specific intent to damage or destroy building); *State* v. *Harrison,* supra, 694, 698 (accessory to attempted robbery and accessory to larceny). Because the substantive crime with which the person was charged in those cases required that the accessory specifically intend to act or bring about a result, it is logical to state that the accessory, in aiding another, must have "intend[ed] to commit the offense with which he is charged."

Section 53a-8, however, is not limited to cases where the substantive crime requires the specific intent to bring about a result.[13] General Statutes § 53a-8 merely

[13] Prior to the enactment of § 53a-8, accessorial liability was imposed for conduct which brought about an unintended result. In *State* v. *DiLorenzo,* 138 Conn. 281, 286, 83 A.2d 479 (1951), this court held that "one who engages with others in a common purpose to carry on an activity in a reckless manner or with wanton disregard for the safety of others is guilty of involuntary manslaughter, if the death of another is caused thereby, even though he is not present when the homicide occurs."

The defendant attempts to distinguish *DiLorenzo* from the present case by claiming that the passage of § 53a-8 significantly narrowed common law accessorial liability, as interpreted in *DiLorenzo.* Apparently, the defendant argues that prior to § 53a-8, there was no requirement that an accessory have the state of mind required for the commission of the substantive offense, while § 53a-8 imposed such a requirement. It has long been recognized in this state, however, that a person must possess a certain degree of mental culpability to be convicted as an accessory. See *State* v. *Laffin,*

requires that a defendant have the *mental state required for the commission of a crime* while intentionally aiding another. "When the commission of an offense . . . or some element of an offense, requires a particular mental state, such mental state is ordinarily designated . . . by the use of the terms 'intentionally,' 'knowingly,' 'recklessly,' or 'criminal negligence' . . . ." General Statutes § 53a-5. Accordingly, an accessory may be liable in aiding another if he acts intentionally, knowingly, recklessly or with criminal negligence toward the result, depending on the mental state required by the substantive crime. When a crime requires that a person act with criminal negligence, an accessory is liable if he acts "with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists." General Statutes § 53a-3 (14).

This interpretation is consistent with the underlying principles of accessorial liability. Such liability is designed to punish one who intentionally aids another in the commission of a crime and not one whose innocent acts in fact aid one who commits an offense. *State v. McCalpine,* 190 Conn. 822, 832, 463 A.2d 545 (1983). "Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate or consummate it." *State*

155 Conn. 531, 536, 235 A.2d 650 (1967); *State* v. *Pundy,* 147 Conn. 7, 11–12, 156 A.2d 193 (1959); *State* v. *Thomas,* 105 Conn. 757, 763, 136 A. 475 (1927); *State* v. *Enanno,* 96 Conn. 420, 425, 114 A. 386 (1921); *State* v. *Scott,* 80 Conn. 317, 322–26, 68 A. 258 (1907). Additionally, the Commission Comment to § 53a-8 indicates that there was no intention to alter substantially the pre-existing law on accessorial liability. Conn. Gen. Stat. Ann. § 53a-8, Commission Comment.

v. *Laffin,* 155 Conn. 531, 536, 235 A.2d 650 (1967); see *State* v. *Crump,* supra, 494; *State* v. *Vincent,* supra, 207. Thus, accessorial liability is predicated upon the actor's state of mind at the time of his actions, and whether that state of mind is commensurate to the state of mind required for the commission of the offense. If a person, in intentionally aiding another, acts with the mental culpability required for the commission of a crime—be it "intentional" or "criminally negligent"— he is liable for the commission of that crime.

Moreover, because accessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed, it would be illogical to impose liability on the perpetrator of the crime, while precluding liability for an accessory, even though both possess the mental state required for the commission of the crime. Connecticut "long ago adopted the rule that there is no practical significance in being labeled an 'accessory' or a 'principal' for the purpose of determining criminal responsibility. See *State* v. *Gargano,* 99 Conn. 103, 109, 121 A. 657 (1923); *State* v. *Hamlin,* 47 Conn. 95, 118 (1879); General Statutes (1875 Rev.) p. 545. The modern approach 'is to abandon completely the old common law terminology and simply provide that a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. Such is the view taken in the Model Penal Code, which provides that a person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of the offense, he solicits the other person to commit it, or aids or agrees or attempts to aid the other person in planning or committing it, or (having a legal duty to prevent the crime) fails to make the proper effort to prevent it.' LaFave & Scott, Criminal Law (1972) § 63, p. 501; see also Model Penal Code (1985) § 2.06, com-

ment 6.[14] Connecticut has taken the same approach through General Statutes § 53a-8. See *State* v. *Baker,* supra." *State* v. *Harris,* supra.

Therefore, a person may be held liable as an accessory to a criminally negligent act if he has the requisite culpable mental state for the commission of the substantive offense, and he intentionally aids another in the crime. For the above reasons, we find that being an accessory to criminally negligent homicide is a cognizable crime under Connecticut law. Accordingly, the trial court did not err either in instructing the jury with respect to the crime or in denying the defendant's posttrial motions.

[14] Accessorial liability has been addressed by § 2.06 of the Model Penal Code, which states in relevant part:

"Section 2.06. LIABILITY FOR CONDUCT OF ANOTHER; COMPLICITY.

"(1) A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

"(2) A person is legally accountable for the conduct of another person when . . . .

"(c) he is an accomplice of such other person in the commission of the offense.

"(3) A person is an accomplice of another person in the commission of an offense if:

"(a) with the purpose of promoting or facilitating the commission of the offense, he

"(i) solicits such other person to commit it, or

"(ii) aids or agrees or attempts to aid such other person in planning or committing it, or

"(iii) having a legal duty to prevent the commission of the offense, fails to make proper effort so to do; or

"(b) his conduct is expressly declared by law to establish his complicity.

"(4) When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense. . . ."

In discussing the liability of an accessory, when a particular result is an essential element to the commission of a crime, comment 7 of § 2.06 states: "[S]ubsection (4) makes it clear that complicity in conduct causing a particular criminal result entails accountability for that result so long as the accomplice is personally culpable with respct to the result to the extent

## II

The defendant next contends that even if the crime of being an accessory to criminally negligent homicide does exist, there was insufficient evidence to support a verdict of guilty and therefore the trial court erred in denying his motion for judgment of acquittal. We disagree.

In addressing a claim challenging the sufficiency of the evidence, we undertake a two part evaluation. " 'We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt. *State* v. *Braxton,* 196 Conn. 685, 691, 495 A.2d 273 (1985); *State* v. *Cimino,* 194 Conn. 210, 211, 478 A.2d 1005 (1984); *State* v. *Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455,

demanded by the definition of the crimes. Thus, if the accomplice recklessly endangers life by rendering assistance to another, he can be convicted of manslaughter if death results, even though the principal actor's liability is at a different level. In effect, therefore, the homicidal act is attributed to both participants, with the liability of each measured by his own degree of culpability toward the result.

"The most common situation in which Subsection (4) will become relevant is where unanticipated results occur from conduct for which the actor is responsible under Subsection (3). His liability for unanticipated occurrences rests upon two factors: his complicity in the conduct that caused the result, and his culpability towards the result to the degree required by the law, that makes the result criminal. Accomplice liability in this event is thus assimilated to the liability for the principal actor; the principal actor's liability for unanticipated results, of course, would turn on the extent to which he was reckless or negligent, as required by the law defining the offense, toward the result in question . . . .

"This formulation combines the policy that accomplices are equally accountable within the range of their complicity with the policies underlying those crimes defined according to results."

79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984).' *State* v. *Sinclair,* 197 Conn. 574, 576, 500 A.2d 539 (1985)." *State* v. *Simino,* 200 Conn. 113, 116–17, 509 A.2d 1039 (1986); see *State* v. *Rodriquez,* 200 Conn. 685, 687, 513 A.2d 71 (1986); *State* v. *Cavallo,* 200 Conn. 664, 673, 513 A.2d 646 (1986).

To establish the crime of being an accessory to criminally negligent homicide, it is incumbent that the state prove beyond a reasonable doubt that the defendant, in intentionally aiding another to engage in the commission of the offense, failed to perceive a substantial and unjustifiable risk that death will occur, and that such death did occur. See General Statutes § 53a-3 (14). In the present case, the state introduced evidence that the defendant was "bitter" about the alleged rape and robbery of his girlfriend and was purposely looking for the perpetrator. The defendant, while walking in the vicinity where the rape and robbery had occurred, saw a man who matched the description of his girlfriend's assailant. The defendant and his companion, Cannon, followed the man, the victim Middleton, behind a building and confronted him in an alleyway. The defendant proceeded to question Middleton regarding the alleged rape and robbery. When Middleton attempted to leave, the defendant pushed him back and told him that he wanted to find out if he was the rapist. Middleton again tried to leave, but a fight ensued, and the defendant proceeded to beat Middleton about the face, eye, chest and head with his fist and a blunt instrument, finally knocking him to the ground. After the fight, the defendant told Middleton to wait at the schoolyard while he went to get his girlfriend to confirm his belief that Middleton had committed the rape. Although Middleton agreed to wait, the defendant handed Cannon a knife to prevent Middleton from

escaping. While the defendant was gone, Middleton was stabbed in the chest and subsequently died as the result of the stab wound.

In a review of the evidence before the jury, it is understood that much of the relevant evidence may be circumstantial. *State* v. *Simino,* supra, 117; *State* v. *Braxton,* supra. "There is, of course, no legal distinction between direct and circumstantial evidence as far as probative force is concerned. *State* v. *Wilson,* 178 Conn. 427, 434, 423 A.2d 72 (1979). 'It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence.' *State* v. *Perez,* 183 Conn. 225, 227, 439 A.2d 305 (1981)." *State* v. *Crump,* supra, 495. What amounts to criminal negligence depends entirely on the circumstances of the particular conduct. Whether, under the circumstances, the defendant, in acting, failed to perceive a substantial and unjustifiable risk that a death would occur and whether that failure constituted a gross deviation from the standard of conduct that a reasonable person would observe is left to the trier of fact. See General Statutes § 53a-3 (14); see also *People* v. *Abbott,* 84 App. Div. 2d 11, 14, 445 N.Y.S.2d 344 (1981).

From the evidence presented, the jury could reasonably have found that the defendant intentionally had aided Cannon by giving him the knife. Additionally, the jury could reasonably have inferred that, in handing Cannon the knife to prevent Middleton from escaping, the defendant had failed to perceive a substantial and unjustifiable risk that death would occur. Contrary to the defendant's claim, there was sufficient evidence to support the conviction. Because the jury could have found the defendant guilty beyond a reasonable doubt if it found the state's evidence credible, the trial court did not err in denying the defendant's motion for judgment of acquittal.

## III

In his final claim, the defendant maintains that he is entitled to a new trial because the trial court's instructions on the essential elements of kidnapping in the second degree violated his due process rights under the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. The defendant claims that the court's instructions regarding the charge of kidnapping, and more specifically, in defining the terms "restrain" and "abduct," were misleading and inadequate, thus diluting the presumption of innocence and allowing a conviction on something less than proof beyond a reasonable doubt of each essential element of the crime with which he was charged. We disagree.

Initially, we note that the defendant did not except to any part of the court's instruction on this charge at trial, but raises this issue for the first time on appeal. A claim not raised at trial is reviewable only if the record adequately supports a claim that the defendant has clearly been deprived of a fundamental constitutional right and a fair trial. *State* v. *Tyler-Barcomb,* 197 Conn. 666, 673, 500 A.2d 1324 (1985), cert. denied, 475 U.S. 1109, 106 S. Ct. 1518, 89 L. Ed. 2d 916 (1986); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). Although the state argues that there has been no clear deprivation of a fundamental constitutional right and fair trial, we will review the defendant's claim, because the failure to instruct the jury adequately on each essential element of the crime charged may have resulted in a violation of the defendant's due process rights implicating the fairness of his trial. *State* v. *Fleming,* supra, 269–70; *State* v. *Sinclair,* 197 Conn. 574, 580, 500 A.2d 539 (1985).

"It is axiomatic that the state is required to prove all the essential elements of the crimes charged beyond

a reasonable doubt in order to obtain a conviction. *In re Winship,* 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). An instruction that dilutes the state's burden, or places a burden on the defendant to prove his innocence, is unconstitutional. *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979).

"It is well established, however, that individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Dolphin,* 195 Conn. 444, 451, 488 A.2d 812 [cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84] (1985); *State* v. *Reid,* 193 Conn. 646, 660, 480 A.2d 463 (1984); *State* v. *Hines,* 187 Conn. 199, 209, 445 A.2d 314 (1982). The whole charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict; *State* v. *Corchado,* 188 Conn. 653, 660, 453 A.2d 427 (1982); *State* v. *Williams,* 182 Conn. 262, 269, 438 A.2d 80 (1980); *State* v. *Piskorski,* 177 Conn. 677, 746–47, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); and not critically dissected in a microscopic search for possible error. *State* v. *Harris,* 172 Conn. 223, 226–27, 374 A.2d 203 (1977)." *State* v. *Reddick,* 197 Conn. 115, 131–32, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). Thus, an error in the charge requires reversal only if, in the context of the whole instruction, there is a reasonable possibility that the jury was misled in reaching its verdict. *State* v. *Fleming,* supra, 269; *State* v. *Sinclair,* supra, 581; *State* v. *Kurvin,* 186 Conn. 555, 558, 442 A.2d 1327 (1982).

The defendant first challenges the court's instruction with regard to the definition of "restrain." The trial court instructed the jury that "[t]here can be in this case no kidnapping unless you find that [the victim] was abducted. To abduct means to restrain a person with intent to prevent his liberation . . . . Restrain means

to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty . . . . So you cannot find kidnapping until you find it established that there was such restriction of movement and that it has been done intentionally; that it has been [done] without right or authority of law and it has had the effect of interfering substantially with the victim's liberty . . . ." The defendant claims that the court inadequately explained that the state must prove that the defendant had to have the conscious objective to interfere substantially with the victim's liberty, and that the court misled the jury by instructing them that the restraint "has the effect of interfering substantially with the victim's liberty," in that it permitted the jury to find the defendant guilty even if the interference was nothing more than an unintended by-product of the defendant's intentional acts. A careful examination of the entire charge belies the defendant's contentions. When the charge is reviewed in its entirety, it is obvious that the court had more than adequately explained the meaning of "restraint,"[15] and it is clear from such a review that

---

[15] The court instructed the jury that "[t]here can be in this case no kidnapping unless you find that [the victim] was abducted. To abduct means to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he's not likely to be found or (b) using or threatening to use physical force or intimidation.

"I have used the word restrain and I'll define what the legislature has defined in Section 53a-91 Subsection 1 in that regard, and I'll quote it. 'Restrain means to restrict a person's movements *intentionally* and *unlawfully in such a manner as to interfere substantially with his liberty* by moving him from one place to another or *by confining him either in a place where the restriction commences* or in a place to which he has been moved without his consent.'

"In this last definition which I have just read to you, the word intentionally appears, and I charge that a person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his *conscious objective* is to cause such result or to engage in such conduct." (Emphasis added.)

the jury was not misled into concluding that the defendant need not intend to interfere substantially with the victim's liberty.

The defendant also challenges the trial court's instruction with respect to the definition of "abduct." The court stated that "[a]bduction may be established by satisfactory proof that the victim has been unlawfully restrained with intent to prevent his liberation. This may be proved if the defendant has done either of one or two things. The first of those is that he's secreted or held the victim in a place where he was not likely to be found, and, second, the restraining was accomplished by using or threatening to use physical force or intimidation. Abduction need not be proved by establishing the use of force or intimidation if the proof establishes that the accused threatened its use in such a manner that the victim reasonably believed that force would be applied if he sought to escape or to thwart the abductor's intention." The defendant contends that the court's charge could mislead the jury into concluding that the acts of the defendant in either holding the victim in a place where he could not be found or using or threatening to use force to restrain the victim would suffice for proof that the defendant intended to prevent the defendant's liberty. Again, the defendant has attempted to dissect and isolate certain segments of the charge from its entirety and thus raise the specter of error. The trial court not only read the statutory definition of abduction to the jury, but also instructed the jury several times that the requisite intent for abduction was the intent to prevent liberation of the victim. Read in its entirety, it is not reasonably possible that the instruction as to the definition of "abduct" misled the jury or removed from the jury's consideration an essential element of the offense of kidnapping.

As we have stated, we do not examine a challenged portion of a jury instruction in artificial isolation from the overall charge. *State* v. *Scognamiglio,* 202 Conn. 18, 27, 519 A.2d 607 (1987); *State* v. *Reddick,* supra, 132; *State* v. *Dolphin,* supra; *State* v. *Hines,* supra, 206. "Rather, we review the entire charge to determine if, taken as a whole, the charge adequately guided the jury to a correct verdict. *State* v. *Hines,* supra. An error in the charge requires reversal only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict." *State* v. *Fleming,* supra, 268–69; *State* v. *Kurvin,* supra.

Keeping in mind that the court carefully explained the meaning of "restrain" and "abduct" on several occasions and that the charge taken in its entirety was thorough and complete, we are satisfied that the jury was properly instructed on the elements of kidnapping in the second degree. We conclude that in the context of the entire charge there is no reasonable possibility the jury was misled.

There is no error.

In this opinion the other justices concurred.